## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )   **Case No.  CR-20-113-G** |
| | ) |
| **JIMMY LEE BROOKS,** | ) |
| | ) |
| **Defendant.** | ) |

## <u>ORDER</u>

Now before the Court is the Motion to Suppress (Doc. No. 22), filed through counsel for Defendant Jimmy Lee Brooks on July 13, 2020.  The Government has responded in opposition (Doc. No. 24) and submitted evidentiary exhibits (Doc. Nos. 24-1 to 24-8).  On October 6, 2020, the Court conducted an evidentiary hearing on the Motion.  Defendant appeared personally and through counsel, William P. Earley.  The Government appeared through Assistant U.S. Attorney Nick Coffey.  The Court heard the testimony of Oklahoma City Police Department ("OCPD") officers Aaron Richards and William Ricketts.[1]  Upon consideration of the evidence and the parties' arguments, the Court denies the Motion.

### I.   Background

Around 6:45 p.m. on March 18, 2020, OCPD officers were dispatched to a beauty-supply store in northeast Oklahoma City, in response to a shooting. When they arrived, they learned that the two persons involved had left the scene.  The officers viewed video

---

[1] The Court finds that the testimony of these witnesses is credible as to the portions relied upon herein.

surveillance footage that they believed showed Defendant and his then-girlfriend S.J. having an argument inside the store, Defendant threatening S.J. in the parking lot with a large knife, and then S.J. fleeing on foot and being picked up by a passing black vehicle. Defendant retrieved a handgun from his vehicle and fired several shots at the black vehicle as it sped away down the street.

S.J. later checked in to Midwest City Regional Hospital with a gunshot wound to the buttock.  When interviewed by Sergeant Richards, she stated that she lived with Defendant in Norman.  She told them that Defendant had a substance-abuse problem.  She also stated that, during their argument, Defendant had threatened her children and family and that she believed he would follow through with those threats.  S.J. advised Sergeant Richards that one place to look for Defendant was "Oakridge" in Del City.

After interviewing S.J. at the hospital, Norman police contacted L.B., Defendant's relative who lives with him in Norman.  The Norman police reported to OCPD that L.B. stated that Defendant had come by that night to pick up a gun or guns and then left.

Later that night, police learned that Defendant might be at the apartment of his cousin D.S. at the Oakridge Apartments in Del City.  Six or seven uniformed OCPD and Del City police officers knocked and announced themselves at Apartment #296, which opened directly to an external breezeway and staircase.[2]  After a few minutes, a woman answered the door, which opened into the living room.

---

[2] Although Sergeant Richards testified that they did not have their guns raised, the body-camera footage indicates that at least one officer had a handgun pointed at the door while they were announcing their presence.

The woman identified herself as D.S. but did not leave the apartment.  At least three other people were seen inside the living room of the apartment.  The officers remained outside the apartment in the breezeway and said they were looking for "Jimmy."  D.S. and the other occupants denied they knew Jimmy, and D.S. informed the police officers that "Jimmy don't stay here."  When the occupants continued to deny that they knew Jimmy or that anyone else was in the apartment, the officers warned them that if they found Jimmy in the apartment the occupants would be arrested for harboring a fugitive.  The occupants refused to identify who else was in the apartment, but D.S. began pointing down the hallway toward the back of her apartment.  The officers then had the occupants exit the apartment through the living room door.

Rather than immediately enter the apartment, the officers remained at the doorway and called for Defendant to come out.  At least one occupant then admitted that Defendant was inside and made statements regarding whether she could get him to come out. Officers thus begin discussing whether Defendant might be fleeing the apartment, with one officer saying, "I can hear him. Check the windows."

Officers then performed a sweep of the apartment.  Defendant was not inside the apartment.  The window in the back bedroom was open.  Officers seized no evidence at this time; nor is there any evidence that they saw a firearm or other contraband inside the apartment.  With their sweep complete, some officers started looking for Defendant outside, and D.S. was permitted to reenter her apartment.

Several officers spoke to D.S. from the breezeway, with D.S. standing at the threshold.  During this time, a female (thought by the officers to be D.S.' daughter) who

3

had been an occupant of the apartment was secured by officers downstairs outside the apartment for being uncooperative.

About 45 minutes after the initial entry and sweep had been conducted, D.S., while talking to two police officers at her doorway, raised her hand and waved the officers inside to continue their conversation. The conversation continued in the living room, with D.S. sitting on her couch and explaining that while she is Defendant's cousin, she "raised him," and that she was afraid for him. D.S. did not ask the officers to leave and was not under arrest. D.S. said that she had just spoken with her grandmother, who told D.S. that Defendant had called the grandmother and admitted to the shooting as soon as it happened.

D.S. also told police officers that Defendant had left a long gun in her bedroom. When Lieutenant Ricketts asked if he could see it, D.S. led the officers to the back bedroom closet. There was a shotgun inside and also a brown purse. The officers put the items on the bed, and then D.S. sat on the bed and continued the conversation with the police while smoking a cigarette. D.S. reiterated that Defendant had brought the shotgun and the purse to her apartment. She reiterated that Defendant had admitted the shooting to their grandmother right after the incident. She also claimed she was worried about Defendant, who visits her every day. Further, she relayed that Defendant told her that he was going to kill S.J.'s "whole family using his guns" and that "he was going to throw Molotov cocktails through her grandmother[']s house windows." Sgt. Richards R. (Doc. No. 24-8) at 1.

II.    *Standard*

"The purpose of a suppression hearing is 'to determine preliminarily the admissibility of certain evidence allegedly obtained in violation of defendant's rights under

the Fourth and Fifth Amendments.'" *United States v. Maurek*, 131 F. Supp. 3d 1258, 1261-62 (W.D. Okla. 2015) (quoting *United States v. Merritt*, 695 F.2d 1263, 1269 (10th Cir. 1982)).  "'The proponent of a motion to suppress has the burden of adducing facts at the suppression hearing indicating that his own rights were violated by the challenged search.'" *Id.* at 1262 (quoting *United States v. Eckhart*, 569 F.3d 1263, 1274 (10th Cir. 2009)).  The government must then prove by a preponderance of the evidence that the search or seizure that occurred was lawful—e.g., that exigent circumstances or another exception to the warrant requirement existed or that the evidence sought to be suppressed was not the fruit of the poisonous tree.  *See id.*; *United States v. Burciaga*, 687 F.3d 1229, 1230 (10th Cir. 2012); *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974).

III.     *Defendant's Motion*

Defendant requests suppression of "any physical or testimonial evidence and fruits thereof" that were obtained during the allegedly unlawful search and seizure, specifically: (a) the statements made by D.S. and (b) the shotgun found at D.S.' apartment.  Def.'s Mot. at 1.

A.  *Statements Made and Evidence Seized*

First, Defendant argues that D.S.' statements to the officers amounted to a coerced confession, "based on threats of arrest and prosecution" and made after an improper entry into the apartment.  *Id.* at 3 (citing *Clanton v. Cooper*, 129 F.3d 1147, 1157-58 (10th Cir. 1997) ("[A] person may challenge the government's use against him or her of a coerced confession given by another person.  'Confessions wrung out of their makers may be less reliable than voluntary confessions, so that using one person's coerced confession at

another's trial violates his rights under the due process clause.'" (quoting *Buckley v. Fitzsimmons*, 20 F.3d 789, 795 (7th Cir. 1994)))).  Defendant relatedly contends that the search of D.S.' apartment was nonconsensual and done absent exigent circumstances, such that—if Defendant can show a privacy interest in the apartment—the evidence and statements obtained from therein must be suppressed as products of an unlawful search. Def.'s Mot. at 5-6.

The Government responds that D.S.' statements were not coerced and the evidence was not seized as a result of any such coercion or unlawful search.  Rather, the relevant entry into the apartment took place after the officers already had exited the apartment and D.S. voluntarily allowed them back in and freely chatted with them.  *See* Gov't Resp. at 12-13.[3]

Having reviewed the evidence in the record, including the two officers' testimony and the exhibits attached to the Government's Response, the Court concludes that, even assuming Defendant has standing to challenge the presentation of statements made by D.S. and the evidence found in the apartment, these statements were not coerced and the evidence was not the result of an illegal entry.

---

[3] The Government also cites multiple cases supporting the proposition that Defendant may not seek suppression of D.S.' statements because Fifth Amendment rights are personal in nature, *see* Gov't Resp. at 10-11.  Defendant's cited authority *Clanton* was addressing a due-process claim under 42 U.S.C. § 1983 and was implicitly overruled by the Tenth Circuit in *Becker v. Kroll*, 494 F.3d 904 (10th Cir. 2007).  *See Estate of Papadakos v. Norton*, 663 F. App'x 651, 657 (10th Cir. 2016).  Although neither party addressed the questionable viability of *Clanton*, the Court need not consider that issue, or reach the Government's standing argument, in light of its conclusion that the officers' entries and search were not coercive or otherwise unlawful, as discussed above.

### 1. First Entry

"The Fourth Amendment generally requires a warrant for searches and seizures within a home; otherwise, the search or seizure is presumptively unreasonable." *United States v. Mongold*, 528 F. App'x 944, 948 (10th Cir. 2013). "The presumption of unconstitutionality for warrantless searches may be overcome by 'reasonable exceptions,'" however, "such as when 'the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment.'" *Id.* (alteration omitted) (quoting *Kentucky v. King*, 563 U.S. 452, 460 (2011)).

When the officers initially arrived at D.S.' apartment, they were attempting to locate Defendant, who was reasonably believed to have: (i) had mental-health issues in the past, (ii) earlier that evening fired shots at a moving vehicle on a public street, with one shot striking the girlfriend Defendant had been arguing with, (iii) made specific threats against the girlfriend and her children, and (iv) stopped by his residence to pick up one or more firearms. The occupants of the apartment gave conflicting accounts as to whether they knew Defendant and whether he was in D.S.' apartment, but most tellingly D.S. pointed toward the back of the apartment in a way that reasonably indicated Defendant was there. An officer heard noises that he believed could be Defendant in the back of the apartment trying to exit.

Thus, the Government has shown that the initial "warrantless intrusion," during which the officers searched the apartment for Defendant, was justified by exigent circumstances, including "hot pursuit of a fleeing felon, . . . the need to prevent a suspect's

escape," and "the risk of danger to the police or to other persons." *Minnesota v. Olson*, 495 U.S. 91, 100 (1990) (internal quotation marks omitted); *accord King*, 563 U.S. at 460 ("Police officers may enter premises without a warrant when they are in hot pursuit of a fleeing suspect.").

### 2. *Second Entry*

Another "reasonable exception" to the warrant requirement for searches and seizures within a home is found when the resident consents to the encounter, provided the officers "'are lawfully present in the place where the consensual encounter occurs' and 'consent is freely given.'" *Mongold*, 528 F. App'x at 952 (quoting *King*, 563 U.S. at 463); *see also United States v. Jones*, 701 F.3d 1300, 1317 (10th Cir. 2012) ("'Voluntary consent' consists of two parts: (1) the law enforcement officers must receive express or implied consent, and (2) that consent must be freely and voluntarily given."). It is the government's burden to prove that consent was given freely and voluntarily, and "the question of whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Jones*, 701 F.3d at 1318 (alteration and internal quotation marks omitted).

The challenged evidence and statements came forth during the officers' second entry into the apartment. Lieutenant Ricketts testified that 45 minutes had elapsed between the first search and the second entry. The evidence indicates that the officers were lawfully present in the breezeway outside D.S.' apartment and treated D.S. respectfully and politely during their conversation. The relevant body-camera video footage reflects that D.S. affirmatively raised her arm and waved the officers into the apartment to continue their

conversation.   Lieutenant Ricketts likewise testified that D.S. "invited me inside her apartment" and ultimately led the police officers to the back bedroom, where she showed the officers the shotgun and the purse and said they had been left there by Defendant.  As noted, D.S. sat on the bed smoking and chatting with the officers while they searched.  There is no evidence that D.S. ever asked the officers to leave.  D.S. expressed that she was talking to the police officers due to a concern for the safety of Defendant.  This evidence reflects that D.S.' conduct "permitted the [OCPD] officers to form a reasonable belief that [D.S.] was authorizing them to follow [her] into [her] residence," such that D.S. "may be deemed to have impliedly consented to their entry of [her] home."  *Id.* at 1321.

Neither the officers' statements prior to the first entry that D.S. could be arrested for "harboring a fugitive" nor the officers' detention of D.S.' daughter prior to the second entry—nor the collective effect of both these actions—rises to the level of duress or coercion, such as would render D.S.' consent involuntary.  Informing a homeowner that he or she could be prosecuted for harboring a fugitive is not, in and of itself, improperly coercive.  *See United States v. Miles*, 16 F. App'x 845, 849 (10th Cir. 2001) (rejecting defendant's argument that the resident's consent was coerced where "[t]he officers never threatened [the resident] for refusing to consent [to a search], they merely advised her that harboring a fugitive was itself a crime"); *United States v. McKinney*, 470 F. Supp. 2d 1226, 1234 (D. Kan. 2007) (finding that statements that homeowner could be prosecuted for harboring a fugitive did not negate consent where "[t]here [was] no indication that these statements were baseless or merely a pretext to coerce" the homeowner).  While detaining a homeowner's adult child for being uncooperative with police could be coercive, the

evidence in this instance reflects that the detention of the daughter was reasonable and that D.S., in her interactions with police and specifically her decisions to invite officers into her apartment and then to show them to the shotgun and the purse, was—in both actuality and appearance—acting out of a desire to cooperate with police and not out of fear that D.S. herself could be subjected to undue detention or other police action. The second entry and ensuing events are most reasonably viewed as the product of "legally sufficient consent" rather the result of duress or coercion. *Jones*, 701 F.3d at 1321; *see United States v. Guerrero*, 472 F.3d 784, 789-90 (10th Cir. 2007) ("Consent may . . . be granted through gestures or other indications of acquiescence, so long as they are sufficiently comprehensible to a reasonable officer.").[4]

### B. Lack of Privacy Interest

Finally, Defendant asserts that he possesses a privacy interest in D.S.' apartment and thus the evidence and statements obtained therein must be suppressed as products of the allegedly unlawful search. *See* Def.'s Mot. at 3-5 (citing *Olson*, 495 U.S. 91).

> "Fourth Amendment rights are personal and cannot be claimed vicariously." *United States v. Valdez Hocker*, 333 F.3d 1206, 1208 (10th Cir. 2003). Accordingly, "[t]he proponent of a motion to suppress has the burden of adducing facts at the suppression hearing indicating that his own rights were violated by the challenged search." *United States v. Eckhart*, 569 F.3d 1263, 1274 (10th Cir. 2009) (internal quotation marks omitted) (quoting *United States v. Allen*, 235 F.3d 482, 489 (10th Cir. 2000)). . . . .
>
> While "[t]he text of the [Fourth] Amendment suggests that its protections extend only to people in 'their' houses," the Supreme Court has held that "in

---

[4] At the hearing, defense counsel suggested that the second encounter was coercively "tainted" by the illegality of the first entry. Because the first entry was lawful and justified by exigent circumstances as described above, it did not taint the second entry that followed it. *See Guerrero*, 472 F.3d at 789; *Mongold*, 528 F. App'x at 952.

some circumstances a person may have a legitimate expectation of privacy
in the house of someone else." *Minnesota v. Carter*, 525 U.S. 83, 89 (1998).
The Tenth Circuit has recognized that, "as a general rule, social guests will
have an expectation of privacy in their host's home," and that "an ongoing
and meaningful connection to [the host's] home as a social guest" may confer
"standing to challenge the government's search and seizure of evidence from
the . . . residence." *United States v. Rhiger*, 315 F.3d 1283, 1286-87 (10th
Cir. 2003).

*United States v. Bullcoming*, No. CR-18-86-G, 2019 WL 4920888, at *1-2 (W.D. Okla.

Oct. 3, 2019) (alterations and second omission in original), *appeal docketed*, No. 20-6125

(10th Cir. Aug. 24, 2020).  Accordingly, "[t]o demonstrate that his individual constitutional

rights were violated" by the warrantless search of D.S.' apartment, Defendant "'must show

that he had a subjective expectation of privacy in the premises searched and that society is

prepared to recognize that expectation as reasonable.'"  *Id.* (quoting *United States v.*

*Higgins*, 282 F.3d 1261, 1270 (10th Cir. 2002)).

The record shows a personal connection between Defendant and his cousin D.S.

For example, D.S. tells the police officers that she "raised" Defendant and that Defendant

visits her every day.  But the record does not support a finding that Defendant had "an

ongoing and meaningful connection" to D.S.' apartment.  *Rhiger*, 315 F.3d at 1287.  For

example, there is no evidence that Defendant engaged in "overnight stays" there.  *Id.*; *see*

*Olson*, 495 U.S. at 96-97 (concluding that the defendant's "status as an overnight guest is

alone enough to show that he had an expectation of privacy in the home that society is

prepared to recognize as reasonable").  Lieutenant Ricketts testified that there was no

indication that a male lived at the apartment or kept belongings there.  There is no evidence

in the record suggesting that Defendant possessed a key to the apartment or otherwise could

enter at his own will.  D.S. stated to officers that "Jimmy don't live here" and additionally mentioned that the woman Defendant "lives with"—at a location other than D.S.' apartment—is the one who was shot.

In light of these circumstances, even assuming the warrantless encounters were unlawfully conducted, Defendant cannot assert the protections of the Fourth Amendment as to the police officers' conduct because he lacked a reasonable expectation of privacy in D.S.' apartment at the time they occurred.  *See Bullcoming*, 2019 WL 4920888, at *2; *United States v. Poe*, 556 F.3d 1113, 1122 (10th Cir. 2009) (explaining that "not every individual 'legitimately on the premises'" has a reasonable expectation of privacy that would demonstrate Fourth Amendment standing).[5]

## CONCLUSION

Accordingly, for the reasons set forth above, the Court DENIES Defendant's Motion to Suppress (Doc. No. 22).

IT IS SO ORDERED this 21st day of October, 2020.

CHARLES B. GOODWIN
United States District Judge

---

[5] Nor can Defendant show that suppression is warranted based upon D.S.' "unprompted" act of handing over the shotgun and purse to the police officers.  *United States v. Wiest*, 596 F.3d 906, 910 (8th Cir. 2010) (denying motion to suppress challenging homeowner's voluntary offering of defendant's clothes to police and finding that, while defendant who fled to his girlfriend's stepmother's home had some expectation of privacy as an overnight guest, he "had no legitimate expectation that his possessions were private from" the stepmother).